**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**ROANOKE DIVISION**

| | | |
|---|---|---|
| **IN RE:** | ) | **CHAPTER 12** |
| | ) | |
| **JAMES R. DICKENSON and** | ) | |
| **PATSY ANN DICKENSON** | ) | **CASE NO. 12-70180** |
| | ) | |
| **Debtors.** | ) | |

---

**MEMORANDUM DECISION**

This case is before the Court upon the objection of New Peoples Bank to

confirmation of the Debtors' Amended Chapter 12 Plan, more specifically to the Debtors'

valuation of the farm land that is subject to the lien of New Peoples Bank. The Debtors and New

Peoples Bank have offered evidence regarding the value of the property and after a review of

that evidence the Court determines that such property has a value of $249,500.


FINDINGS OF FACT

The Debtors filed a petition under Chapter 12 of the Bankruptcy Code and

supporting schedules on February 3, 2012. On Schedule A the Debtors valued 179.5 acres,

including a corn crib and water system, located in Russell County, Virginia, at $131,600. On

Schedule D the Debtors noted a claim of New Peoples Bank in the amount of $462,000, which is

secured by the land listed above as well as a McCormick tractor which the Debtors value at

$40,000 and a John Deere hay baler which they value at $20,000. The Debtors represented that

$270,400 of the claim was unsecured and also that the claim was disputed. On March 23, 2012,

the Debtors filed an Amended Schedule D that added cows, with a value of $20,000, to the

property securing New Peoples Bank's lien which reduced the unsecured portion of the debt to

$250,400.  The Debtors filed their first Chapter 12 Plan on May 1, 2012.  In this plan they

proposed to pay New Peoples Bank $211,600, the amount of the secured claim according to

Amended Schedule D, over twenty years at 5% interest in annual installments.  The Debtors

proposed to pay their unsecured creditors $37,200 over sixty months.  The total of their

unsecured debt listed in the plan was $261,387, which included the unsecured portion of New

Peoples Bank's loan.  The plan noted an estimated distribution to unsecured creditors of 12%.

On May 26, 2012, New Peoples Bank filed an Objection to Confirmation of Plan.

On June 20, 2012, New Peoples Bank filed proof of claim #8 in the total amount

of $462,685.56, of which $395,000 is listed as secured.  On that same date, confirmation of the

Debtors' proposed Chapter 12 Plan was denied and the Debtors were granted twenty-eight days

to file an amended plan.  The Debtors filed their first Amended Chapter 12 Plan on July 18,

2012, and then their corrected Amended Chapter 12 Plan on July 20, 2012.  This plan increased

the amount to be paid to New Peoples Bank on the secured portion of their claim to $275,000

under the same terms.  The Debtors proposed to pay their unsecured creditors $31,920 over sixty

months.  The total of their unsecured debt listed in the Amended Plan was $197,890.83, which

included the reduced unsecured portion of the debt secured by the lien in favor of New Peoples

Bank.  The Amended Plan noted an estimated distribution to unsecured creditors of 15%.  On

August 22, 2012, New Peoples Bank filed an Objection to Plan Confirmation.

The confirmation hearing on the Debtors' First Amended Plan and the Objection

of New Peoples Bank came on to be heard on September 5, 2012, but was continued at the

request of the parties to October 3, 2012.  The Debtors and New Peoples Bank filed appraisals of

the real estate on October 3, 2012.  On that date all matters were again continued at the request

of the parties to November 20, 2012.  On October 4, 2012, the Debtors filed their Second

Amended Chapter 12 Plan.  The only significant provision altered from the preceding plan was

the time by which payments to New Peoples Bank were to begin.  On November 16, 2012, the

Debtors filed a motion to continue the hearing due to their inability to procure the appraiser at

the hearing set for November 20, 2012.  On November 20, 2012, the Court granted the request

and effectively bifurcated the hearing as the appraiser for New Peoples Bank appeared and was

prepared to testify.  The Court heard testimony from New Peoples Bank's appraiser, Mr. Larry

E. Johnston, regarding his credentials and methods for valuation.  His appraisal values the

property as of April 12, 2012 at $339,000 which he arrived at by applying a valuation of $1,900

per acre to the calculated total size of 178.233 acres for a total of $338,884 which he rounded to

$339,000.  This opinion was confirmed by his testimony at the hearing.  On January 9, 2013, the

Debtors' appraiser, Mr. Michael B. Mason, appeared and offered his testimony regarding his

valuation of the property.  He values the property as of August 22, 2012 at $187,000 and he

likewise confirmed that valuation in his testimony.  His appraisal does not disclose precisely

how he arrived at his valuation of $187,000.

According to Mr. Johnston's appraisal the Debtors acquired the property in two

separate transactions.  The first acquisition was by deed dated October 2, 1997 from George and

Evelyn Taylor to the Debtors.  The total acreage listed in the deed is 114.113 acres at a purchase

price of $102,600.  The second acquisition was by deed dated November 12, 1999 from Cosam

and Brenda Mullins to the Debtors.  The total acreage stated in that deed is 89.96 acres.  The stated

consideration in that deed is a nominal one, but the grantor tax of $120 paid upon its recordation

indicates an actual purchase price of $120,000.  These two purchases together totaled 204.073

acres.  The Debtors then sold 23.18 acres of this property to Lou and Annette Keith by deed dated

May 3, 2010.  That deed states a sale price of $130,000.  The property included an older dwelling,

a barn, and outbuildings.  Neither appraiser selected this transaction as a potential comparable sale

for the remainder of the property.  The Debtors also transferred 2.57 acres to James and Shirley

Dickenson[1] by Deed of Gift.  After these two transfers the Debtors were left with 178.323 acres.

The Russell County tax assessed value of the 178.323 acres still owned by the

Dickensons is $45,500 for the 66.78 acre tract and $86,100 for the 111.543 acre tract for a total of

$131,600.  This amount includes both land and improvements and according to Mr. Johnston's

appraisal is supposed to be at 100% of "market value."  Mr. Johnston also states that Russell

County has a different tax system for agricultural properties in that they are assessed at a lower

"rate," by which he appears to mean value, than non-agricultural properties.  According to a chart

appearing at page 3 of his appraisal, the "land use value" of the real property (apparently not

including the improvements valued at $4,500) is $55,900.

After hearing the testimony of both parties' appraisers, the Court took the matter

under advisement.  Counsel for the Debtors and counsel for the Bank have submitted their written

arguments on the issue before the Court.  After review of the written arguments submitted by

counsel for both parties, the Court requested testimony from at least one of the Debtors regarding

the sale to the Keiths as well as the basis for their valuation.  On February 6, 2013, Mr. Dickenson

appeared.  He offered testimony that he used the tax assessed value in valuing the real property in

his original schedules.  He also discussed the 2010 sale to Mr. and Mrs. Keith of approximately 23

acres as including some amount of timber and a house that was 115 years old.  The Debtor stated

---

[1] The Court understands these individuals to be the Debtors' son and daughter-in-law.

that he and his wife originally listed the property with a real estate agent at the price of $150,000

but accepted the Keiths' offer of $130,000.  He estimated that approximately $70,000 of the sale

price was allocated for the house and $60,000 was for the land.  The Debtor was unable to explain

the basis for setting the initial listing price of $150,000 or the thinking behind accepting the offer

for $20,000 less.  According to a photocopy of a survey included with the Johnston appraisal, the

parcel sold to the Keiths contains a significant amount of road frontage on Secondary Route 640.

Mr. Dickenson also addressed the attempted auction of the property on August 20,

2011.  The auction was to include all of the land currently at issue as well as the property that was

transferred to his son and daughter-in-law.[2]  He testified that the auction was well advertised and

attended by roughly twenty-five individuals.  He stated that the total final sale price at the auction

for all three tracts of land was approximately $160,000.[3]  The auction bids were not accepted

because they were considered too low.  Mr. Dickenson also indicated that since the filing date he

has upgraded a majority of the fencing and continues to raise cattle and sheep and grow tobacco

and hay on the property.

At the conclusion of the supplemental hearing at which Mr. Dickenson testified, his

counsel offered to provide tax assessment information to the Court with respect to the property

sold to the Keiths, which the Court welcomed.  Counsel for the Debtors, with the approval of

---

[2] According to testimony, the property belonging to the Debtors' son had a doublewide mobile home on it which was encumbered by a mortgage with an outstanding loan balance of approximately $90,000.  Debtors' counsel stated during the hearing that the total of the high bids at the auction was $168,000.

[3] This figure did not take into account satisfaction of the son's mortgage obligation.  Mr. Dickenson testified that, had the auction sale gone through, $90,000 would have been paid from the $160,000 auction price to satisfy the mortgage leaving net proceeds of $70,000.

counsel for New Peoples Bank, filed the tax assessment records as docket entries # 60 - 64.  The

tax records included with the stipulation can be summarized as follows:  the tax ticket for 2010

valued the "Reeds Valley" property, consisting of 68.5 acres, at a total of $67,900.  In 2011 that

property size was reduced to 66.78 acres (as a result of the sale to the Keiths) and was valued at

$66,400, a reduction of $1,500.  In 2010 the "Robert Davis Estate" property, consisting of 21.46

acres, was valued on the tax ticket at $72,200 of which $17,800 was allocated to land and $54,400

was apportioned to improvements.  This tax ticket is dated May 3, 2010, the same date that

property was sold to the Keiths.  In 2011 this tract was increased on the tax records to 23.18 acres

(to reflect the addition of the 1.72 acre parcel from the "Reeds Valley" property) with the land

value being increased by $4,000 from $17,800 to $21,800 and the improvements remaining at

$54,400 for a total valuation of $76,200.  The same value was attributed to the property in 2012.

All evidence is now in and the issue is now ready for decision.


CONCLUSIONS OF LAW

This Court has jurisdiction of this matter by virtue of the provisions of 28 U.S.C. §§

1334(a) and 157(a) and the delegation made to this Court by Order from the District Court on July

24, 1984 and Rule 3 of the Local Rules of the United States District Court for the Western District

of Virginia.   The Court further concludes that the determination of the value of the Bank's secured

claim against property of the bankruptcy estate, which thereby also decides the amount of its

unsecured claim against the estate, is a "core" bankruptcy proceeding within the meaning of 28

U.S.C. § 157(b)(2)(B), (L) and (O) because it involves allowance of claims against the estate, the

determination of a value necessary to be arrived at for the purpose of confirmation of a plan, and is

6

a proceeding "affecting . . . the adjustment of the debtor-creditor . . . relationship[.]"

In the case of *In re Brown*, 244 B.R. 603 (Bankr. W.D. Va. 2000), this Court took

up the question of which party bears the burden of proof on the value of collateral for "cramdown"

purposes in a Chapter 13 case.  This Court determined that the debtor continued to have that

burden even when the issue came before the court on a creditor's objection to confirmation,

commenting that to rule otherwise would result "in a 'Catch 22' situation where the debtor has the

burden of proof to establish compliance with Chapter 13 requirements except in those situations

where a creditor actually denies that such requirements have been met."  244 B.R. at 611.  The

same logic applies here in this Chapter 12 case:  the debtor has the burden of proof to establish that

the property serving as collateral for a loan is worth less than the debt to the creditor secured by

that collateral even though the issue comes before the court on a trustee or creditor's objection to

confirmation.

It is important to note that the critical point of valuation is the date of filing, not the

date on which the matter is heard.  This Court has elaborated on the issue in the context of a

Chapter 13 case:

> The official proof of claim form, in accordance with the wording of the
> statute, requires the creditor to state the "total amount" of its claim "at
> time case filed". It also requires the creditor to state if its claim is
> secured by collateral and, if so, the value of the collateral. The logical,
> although admittedly not inescapable, conclusion is that the value of the
> collateral is also to be valued as of the date of filing, a conclusion
> reinforced by the practical aspects of the proof of claim being due
> relatively soon after the commencement of the case.

*In re Allen*, 240 B.R. 231, 236-37 (Bankr. W.D. Va. 1999).  The Court has found no reason to fault

its analysis in *Allen* and believes that it is equally applicable to this Chapter 12 case.

In valuing the Debtors' property, which both parties recognize is worth less than the

bank's loan balance which is secured by a lien against the property, the Court is instructed by 11

U.S.C. § 506(a) that such value "shall be determined in light of the purpose of the valuation and of

the proposed disposition or use of such property."  In this case the purpose is to determine the

value of New Peoples Bank's secured claim against the Debtors' real property and the intended

use of the property is their retention and continued use of such property for agricultural purposes.


DISCUSSION

Both appraisers have utilized a comparable sales approach to valuing the property.

Both appraisers also testified as to the difficulty in selecting comparable sales and the process

through which each made adjustments to the various comparable sale prices.  The five comparable

sales used by the Debtors' appraiser, Mr. Mason, are significantly different in size in relation to

each other.  His first comparable, a 2011 transaction, is 99.5 acres; the second, 57.4 acres (2010);

the third, 231.41 acres (2009); the fourth, 181 acres (2009); and the fifth, 93.78 acres (2007).  Mr.

Mason lists the Dickenson property as 179.5 acres.  While one property selected as a comparable

is right on target with regard to acreage, the others vary appreciably from the size of the subject

property, one is about 30% larger and the others significantly smaller, with the least being less

than one-third of the size of the Dickenson property.  Mr. Johnston used six comparable sales.  The

first is 113.41 acres (2004); the second, 124 acres (2005); the third, 173.35 acres (2005); the

fourth, 189.86 acres (2004); the fifth, 161.739 acres (2004); and the sixth, 211 acres (2002).  There

was no overlap in the selection of comparable sales between the two appraisers.  While the

comparables selected by Mr. Johnston are generally much closer in size to the subject property,

they are also significantly older than the comparables that Mr. Mason has chosen.  In his report

Mr. Johnston elaborated, "The area market for improved farm land or a grazing boundary similar

to the subject showed an appreciation of three to five percent annually from 2001 through 2007.

In 2008, the market went flat and appears to have remained so since that time."  In his testimony

he reiterated that fact and stated that he adjusted the comparable sale prices to reflect those

assumptions.

        The comparable sales Mr. Mason used involved sale prices ranging from $68,000 to

$450,000 prior to any adjustments.  After adjustments based on property features, Mr. Mason's

comparable sale prices ranged from $155,000 to $317,000 with the average of the five properties

being $213,000.  The largest of these adjusted sales prices, which is for the 231.41 acre tract

(Mason comparable # 3), a 2009 transaction, is equivalent to a per acre value of $1,766 for a 179.5

acre tract.[4]  The 181 acre property (Mason comparable # 4), also a 2009 transaction, did not

require any adjustment at all for size and its adjusted sale price of $182,000 is equivalent to a per

acre price for the Dickenson property of 179.5 acres of $1,014 (rounded) per acre.  Leaving off the

highest and lowest figures provides a range of $182,000 to $213,000 of adjusted sale prices and an

average of $197,667, which is equivalent to $1,109 per acre (rounded).  Mr. Johnston's

comparables, prior to any adjustments, have sale prices between $163,000 and $540,000.[5]  Mr.

Johnston's comparables, after adjustments, ranged from $211,850 to $362,076 with the average of

[4] The largest of the adjustments made by Mr. Mason to this comparable sale was a reduction of $104,000 to account for the difference in property size as compared to the subject property being appraised.

[5] On November 11, 2012 during Mr. Johnston's testimony he clarified that the property price listed in the appraisal for the "Ruckus Hill" property was in error.  It was actually $540,000, not $650,000.

9

the six being $302,082.  If just the two Russell County transactions were considered, the adjusted

per acre valuation would be $1,868 and $1,716 per acre.  Mr. Mason's comparable sales generally

are in closer proximity to the Debtors' property than Mr. Johnston's selections.  Mr. Mason's

sales, according to his appraisal, are 10 miles, 4 miles, 6 miles, 10 miles, and 8 miles away from

the Debtors' land and apparently all are located in Russell County where the Dickensons' property

is situated, while Mr. Johnston's comparables include properties not only in Russell County but

also three in Tazewell County and one in Smyth County.  Mr. Johnston testified that in his

experience values in the three counties for working farms are similar.

In the Court's view there are significant problems with both appraisals.  I will

endeavor to substantiate that assessment in the following paragraphs.

While the quantity of general information and detail about his selected sales

provided in the Johnston appraisal seems more impressive than what is contained in the Mason

appraisal, the merits of the comparable transactions Mr. Johnston has selected to provide a

foundation for his opinion are more problematic.  The most recent of those sales are two 2005

transactions which took place about seven years prior to the filing date, and the earliest

transaction, the 2002 sale, is ten years prior to such date.  Four of the six comparable sales selected

are located outside of Russell County.  Although Mr. Johnston, according to the information

contained in his appraisal, had actually inspected all six of the comparable properties, the most

recent of those inspections occurred in 2007.  This selection of such dated comparables is difficult

to square with the general explanation of the "Sales Comparison Approach to Value," appearing

on page thirteen of Mr. Johnston's appraisal, that such technique seeks to compare the sale prices

of  "properties that are considered to be recent sales and have similarities with the subject."  One

cannot help but wonder if Mr. Johnston is overly relying on information accumulated over a period

of many years in the appraisal business in this general region rather than seeking out and viewing

similar properties involved in more recent transactions.  Indeed his own appraisal characterizes

each of the six selected comparable transactions as an "older sale."

On the other hand, although Mr. Mason has chosen much more recent transactions,

his appraisal does not make clear the extent of his personal familiarity with the properties which

were the subject of those transactions.  Such appraisal does certify his personal inspection of the

subject property, but does not make any similar representation with respect to the comparable

properties and cites MLS records as the source of his data for those properties.[6]  Especially

considering the wide range of adjusted sales prices for the properties Mr. Mason regarded as

comparable, it seems odd that his appraisal does not include any discussion of which ones he

considered to be the best indicators of the subject property's value and why.  Even more curious is

that the Mason appraisal states that there had been "4 comparable sites sold in the past 12 months in

the subject neighborhood ranging in sale price from $80,000 to $225,000" but apparently none of

them was used in preparing the report.[7]  It likewise seems odd that neither of the appraisers

considered it worthwhile to examine the particulars of the 2010 Dickenson/Keith sale in a market

transaction between unrelated parties involving a sale of over twenty acres of the very property of

which the subject property constitutes the residue as to what that transaction might be able to tell us

about such residue's market value two years later.  Neither does either of the appraisers mention the

---

[6] In his testimony before the Court Mr. Mason testified that he utilized MLS records with
a "street view" of the comparables selected.

[7] The 2011 comparable sale which Mr. Mason did utilize in his  report occurred eighteen
months before the date of his appraisal of the Dickensons' property.

bids obtained in the aborted pre-bankruptcy auction sale of the subject property and the parcel

which they gave to their son and daughter-in-law, which Mr. Dickenson testified to have been a

public and well advertised auction by a professional auction company, but it is not clear that they

were even advised as to the facts of that sale effort.

What does seem relatively clear is that neither of the appraisers put much weight, if

indeed any at all, on the "market value" tax assessments made by Russell County for the two

parcels making up the subject property.  The Mason appraisal is on the order of about 1.5 times the

tax assessed value while the Johnston appraisal is on the order of approximately 2.5 times that

figure.  The fact that a 2010 arm's length transaction for a reported sale price of $130,000 of a

property valued by the County the following year as having a market value of $76,200,

approximately 59% of the actual transaction price, also gives the Court ample reason to steer clear

of much reliance on the County's assessment.  If a similar factor were applied to the County's

assessment value of $131,600 for the Debtors' remaining property, the resulting market value figure

would be approximately $225,000.

In Mr. Dickenson's testimony he estimated that $70,000 of the total $130,000 sale

price of the property sold to the Keiths could fairly be allocated to the value of the residence located

on that property.  Such an allocation would result in a corresponding allocation of $60,000 to the

land containing 23.18 acres or $2,588 per acre on a pro rata basis.  That tract, however, contained

significant road frontage on a state secondary road while a much greater portion of the remaining

property is back from that road, which persuades the Court that utilization of such a per acre figure

derived from the Keith transaction is not appropriate.  It can serve, though, as an indicator of value

and of the existence of a viable market for the sale of land in Russell County.

DECISION

The Debtors acquired the subject property and some additional acreage making a total of 204.073 acres by two deeds in 1997 and 1999 for an aggregate purchase price of $222,600. From this total property they gave their son and daughter-in-law a lot containing 2.57 acres and they sold 23.18 acres with the improvements located thereon for $130,000 in 2010. For about ten years following their initial purchase in 1997 their property steadily appreciated in value. Since then at best its value has been fairly stagnant and perhaps has depreciated. The age of Mr. Johnston's purported comparable sales gives the Court considerable doubt that it is reasonably possible to adjust their valuations over a range of seven to ten years and arrive at a realistic indication of their value at the end of such a period of time. Furthermore, the Court is not persuaded that two of the Tazewell County properties are appropriate comparable properties to the Debtors' property. Access to one of them (# 2) is provided by a right-of-way from U. S. Route 460, which is markedly different than the subject property's location on a state secondary road, albeit with actual frontage on that road. Another of them (# 4) is located in the Burkes Garden area of Tazewell County which enjoys a wide reputation as a place of noteworthy beauty and desirability.

The Court is persuaded that Mr. Mason's appraisal, even with its noted criticisms, is considerably closer to the actual value of the Debtors' property in 2012 than is Mr. Johnston's report. Just how much closer is a much more difficult assessment to render. The Court believes that Mason comparable sale # 3 indicating an adjusted value of $1,766 per acre provides a parameter of value on the high side for the Dickenson property while his comparable # 4 of $1,014 per acre provides a similar parameter of value on the low side. Both of these were 2009 transactions for Russell County acreage tracts and both appraisers seem to believe that 2009 values

are not materially different, if any at all, from 2012 values.  Bearing in mind that the Debtors bear

the burden of proof on this issue, the Court, after difficult and lengthy deliberation, finds and

concludes that an average of such per acre adjusted prices, a figure of $1,390, is the closest it can

come on the basis of the evidence presented to rough justice between the Debtors and their lender.

Applying that value to a property of approximately 179.50 acres yields a product of a few dollars

over $249,500, which the Court determines to be the value of the subject property.

An Order in accordance with this Memorandum Decision will be entered

contemporaneously herewith.

Decided this 22nd day of February, 2013.

_____
UNITED STATES BANKRUPTCY JUDGE